

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | CRIMINAL NO. |
| IVAN ALEXIS GUEDEZ | § § § | **18 CR 611** |
| Defendant | § | |

## INFORMATION

THE UNITED STATES CHARGES:

### Introduction

At all times material to this information:

1. Petroleos de Venezuela S.A. (together with its subsidiaries and affiliates, "PDVSA") was the Venezuelan state-owned and state-controlled oil company. PDVSA was responsible for the exploration, production, refining, transportation, and trade in energy resources in Venezuela and provided funding for other operations of the Venezuelan government. PDVSA and its wholly-owned subsidiaries, including PDVSA Services, Inc. ("PSI"), were "instrumentalities" of the Venezuelan government as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2(h)(2)(A).

2. Defendant **IVAN ALEXIS GUEDEZ** ("Defendant"), a United States citizen and resident of Texas, was employed by PDVSA, or by wholly-owned

1

subsidiaries or affiliates thereof, from in or around 2006 until in or around early 2011. During that time, Defendant held a number of positions related to procurement, including serving as the purchasing manager for PSI, the PDVSA procurement subsidiary in Houston, Texas. Defendant's job responsibilities included approving and releasing purchase orders and adding vendors to PDVSA contract bid lists. While employed at PDVSA, Defendant was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

3.  At all relevant times, "CO-CONSPIRATOR 1," an individual whose identity is known to the United States and who has been charged separately, was employed by PDVSA or by wholly-owned subsidiaries or affiliates thereof. CO-CONSPIRATOR 1 was a naturalized United States citizen and a resident of Texas. During the relevant time period, CO-CONSPIRATOR 1 held a number of management positions related to procurement for PDVSA, including sourcing supervisor and manager for planning and strategic sourcing. CO-CONSPIRATOR 1's responsibilities included supervision of single source procurement and competitive bidding processes, including selecting companies for bidding panels. CO-CONSPIRATOR 1 was thus a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

4. At all relevant times, "CO-CONSPIRATOR 2," an individual whose identity is known to the United States, was employed by PDVSA or by wholly-owned subsidiaries or affiliates thereof. CO-CONSPIRATOR 2 was a naturalized U.S. citizen. CO-CONSPIRATOR 2 was a PDVSA buyer who reported to Defendant. CO-CONSPIRATOR 2 was thus a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

5. "COMPANY A," a company whose identity is known to the United States, was a Miami-based supplier of industrial equipment. COMPANY A was PDVSA's exclusive supplier of heavy equipment manufactured by another company headquartered in the United States. COMPANY A was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A).

6. At all relevant times, "CO-CONSPIRATOR 3," an individual whose identity is known to the United States, was the sales manager of COMPANY A and a resident of Florida. CO-CONSPIRATOR 3 was thus a "domestic concern" and an employee and agent of a domestic concern as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and (h)(1)(A).

7. At all relevant times, "CO-CONSPIRATOR 4," an individual whose identity is known to the United States, was a manager at COMPANY A and CO-CONSPIRATOR 3's supervisor. CO-CONSPIRATOR 4 was also a resident of

3

Florida. CO-CONSPIRATOR 4 was thus a "domestic concern" and an employee and agent of a domestic concern as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and (h)(1)(A).

## COUNT ONE

### (18 U.S.C. § 371 – Conspiracy)

8. Beginning in or around 2009 and continuing through at least 2013, the defendant,

### IVAN ALEXIS GUEDEZ,

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly conspire, confederate, and agree with others known and unknown to the United States, including CO-CONSPIRATORS 1, 2, 3, and 4, to commit offenses against the United States, namely

   a. knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, to conduct or attempt to conduct such a financial transaction which in fact represented the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United

4

States Code, Section 78dd-2, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b. transporting, transmitting, or transferring, or attempting to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

## **Purpose of the Conspiracy**

9. The purpose of the conspiracy was for Defendant, CO-CONSPIRATORS 1, 2, 3, and 4, and others to engage in financial transactions to conceal and disguise bribe payments to Defendant, CO-CONSPIRATOR-1, CO-CONSPIRATOR 2, and others, all in an effort by CO-CONSPIRATOR 3 and CO-CONSPIRATOR 4 to secretly and illegally gain an improper advantage for Company A in obtaining and retaining business with PDVSA.

## Manner and Means of the Conspiracy

10. The manner and means by which Defendant and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

11. Beginning in or around 2009 and continuing through at least 2013, the conspirators would and did agree that 3% of every payment made by PDVSA to COMPANY A would be split as bribe payments and kickbacks as follows:

   a. Initially, as an even four-way split between bribes to Defendant, CO-CONSPIRATOR 1, and CO-CONSPIRATOR 2, and kickbacks to CO-CONSPIRATOR 3;

   b. After CO-CONSPIRATOR 2's employment at PDVSA was terminated, evenly split between Defendant, CO-CONSPIRATOR 1, and CO-CONSPIRATOR 2; and

   c. From in or around March 2012, after CO-CONSPIRATOR 4 approached the others and demanded a share in exchange for not exposing the scheme, until at least 2013, CO-CONSPIRATOR 4 received 0.5% while Defendant, CO-CONSPIRATOR 1, and CO-CONSPIRATOR 3 split the remaining 2.5%.

12. In exchange for the bribe payments, Defendant, CO-CONSPIRATOR 1, and CO-CONSPIRATOR 2 would and did direct PDVSA business toward

COMPANY A, including by encouraging end users to request equipment sold by COMPANY A, and work to ensure PDVSA paid COMPANY A's outstanding invoices.

13.  The conspirators would and did attempt to conceal, and did in fact conceal, the nature, source, and ownership of the bribes, which they referred to as "commissions," by:

    a. Using a Panamanian shell company and a corresponding Swiss bank account to receive the 3% payments;

    b. Creating and using multiple email accounts under the name of a shell company and other fictitious names to discuss the scheme;

    c. Creating and transmitting false invoices in the amount of 3% of whatever payment PDVSA had made to COMPANY A; and

    d. Dispersing the proceeds from the Swiss bank account to each co-conspirator, including through offshore accounts, accounts in the names of relatives, and companies owned in the name of the relatives.

## Overt Acts

14.  In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, in the

Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

15. In or around 2009, Defendant, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and CO-CONSPIRATOR 3 met at a restaurant in Houston, Texas, to discuss COMPANY A's business with PDVSA, during which the co-conspirators agreed that the PDVSA officials would assist COMPANY A in retaining and obtaining business with PDVSA and obtaining payment from PDVSA in exchange for bribe payments amounting to 3% of each payment COMPANY A received from PDVSA, which the co-conspirators would split amongst themselves.

16. On or about October 28, 2011, CO-CONSPIRATOR 3 sent an email to Defendant and CO-CONSPIRATOR 1 containing a chart that listed various payments from PDVSA to COMPANY A. The chart stated that the total amount of payments to COMPANY A was $2,762,698.44, and the corresponding 3% payment for the conspirators was $82,880.95.

17. On or about November 2, 2011, Defendant sent an email to CO-CONSPIRATOR 4 containing a chart with the same financial breakdown as the email mentioned in Paragraph 16. Defendant attached to the email a false invoice dated November 2, 2011, in the Panamanian shell company's name, for $82,880.95.

8

18. In or around November 2012, Defendant recorded in a spreadsheet tracking the bribe proceeds that COMPANY A had deposited $82,880.95 into the Swiss bank account in payment for the false invoice dated November 2, 2011.

19. On or about December 2, 2012, CO-CONSPIRATOR 3 sent an email to Defendant and CO-CONSPIRATOR 1 containing a chart which listed payments from PDVSA to COMPANY A for invoices issued in June and July 2012. The chart stated that the total amount of payments to COMPANY A was $2,073,905.69, and the corresponding 3% "commission" totaled $62,217.17.

20. On or about December 26, 2012, Defendant sent an email to CO-CONSPIRATOR 4, containing a chart with the same financial breakdown as the chart mentioned in Paragraph 19. Defendant attached to the email a false invoice dated December 23, 2012, in the Panamanian shell company's name, for $62,217.17.

21. In or around December 2012, Defendant recorded in a spreadsheet tracking the bribe proceeds that COMPANY A had deposited $62,217.17 into the Swiss bank account in payment for the false invoice dated December 23, 2012.

22. In or around 2012 or 2013, Defendant and CO-CONSPIRATOR 1 created a fictitious company and wired $650,000.00 from the Swiss account to a relative of Defendant's, which corrupt proceeds a second relative of Defendant's later used to purchase a lot in Katy, Texas under the name of the fictitious

company. Relatives of Defendant and CO-CONSPIRATOR 1 were listed as the owners of the fictitious company.

All in violation of Title 18, United States Code, Section 371.

## Notice of Criminal Forfeiture

23. Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice to **IVAN ALEXIS GUEDEZ** that in the event of his conviction of the offense charged in Count One of the Information, the United States intends to seek forfeiture of all property, real or personal, involved in money laundering offenses or traceable to such property.

## Property Subject to Forfeiture

24. Defendant is notified that the property subject to forfeiture includes, but is not limited to, the following property referenced in paragraph 22 (or its net sales proceeds if sold by agreement):

The approximately 10.723 acres of real property on Willow Lane in Fort Bend County, Texas, legally described as a 10.7230-acre tract out of a called 12.6787-acre tract of land situated in the I & G.N. Railroad Company Survey, Abstract No. 366, Fort Bend County, Texas.

## Money Judgment

25. The United States gives notice that it will seek a money judgment against the Defendant.

## Substitute Assets

26. Defendant is notified that in the event that property subject to forfeiture, as a result of any act or omission of Defendant,

    a. Cannot be located upon the exercise of due diligence;

    b. Has been transferred or sold to, or deposited with, a third person;

    c. Has been placed beyond the jurisdiction of the Court;

    d. Has been substantially diminished in value; or

    e. Has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of Defendant up to the amount of the money judgment.

RYAN K. PATRICK  
UNITED STATES ATTORNEY

BY: *(signature)*  
JOHN P. PEARSON  
ROBERT JOHNSON  
ASSISTANT UNITED STATES ATTORNEYS

SANDRA MOSER  
ACTING CHIEF,  
FRAUD SECTION  
CRIMINAL DIVISION  
DEPARTMENT OF JUSTICE

BY: /s/ SP  
SARAH EDWARDS  
JEREMY R. SANDERS  
TRIAL ATTORNEYS